MARTIN R. BADER (*Pro hac vice*)
mbader@sheppardmullin.com
JESSE A. SALEN (*Pro hac vice*)
jsalen@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone:    858.720.8900

PATRICK McGILL (*Pro hac vice*)
patrick@mcgillco.com
MCGILL & CO., P.C.
5580 La Jolla Blvd, Suite 39
La Jolla, CA  92037
Tel: (619) 974-8886

Nathan D. Thomas (USB #11965)
Elizabeth M. Butler (USB #13658)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 532-1234
nthomas@parsonsbehle.com
lbutler@parsonsbehle.com

*Attorneys for Defendant BlendJet Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **BLENDTEC INC.**, a Utah corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>**BLENDJET INC.**, a Delaware corporation,<br><br>            Defendant. | **DECLARATION OF MATTHEW L. LALLI IN SUPPORT OF BLENDJET'S RESPONSE TO BLENDTEC'S MOTION TO ENFORCE THE PROTECTIVE ORDER, TO DISQUALIFY PATRICK MCGILL AND SHEPPARD MULLIN, AND FOR ATTORNEYS' FEES**<br>**[REDACTED VERSION]**<br><br>Civil No. 2:21-cv-00668-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

1

I, Matthew L. Lalli, declare as follows:

1. I have been retained by Sheppard Mullin to provide expert opinion testimony regarding the standards of care and practice with respect to the issues raised in Blendtec's Motion to Disqualify. My qualifications and my opinions are set forth below. I have been assisted in my analysis by Brandon Fuller, an associate in my law firm.

2. A description of the scope of my practice is included in my *curriculum vitae*, a copy of which is attached as **Exhibit A**.

3. A list of materials relied upon in conducting my analysis and forming my opinions is described herein is attached as **Exhibit B**.

## I.    Qualifications.

4. I am a litigation and trial attorney with the law firm of Snell & Wilmer L.L.P., practicing in Salt Lake City, Utah. I am an equity partner in the firm and am the firm's Commercial Litigation Practice Group Leader, overseeing our commercial litigation attorneys across the country. I am licensed to practice in Utah, California, and Arizona. I have provided expert testimony on multiple occasions but only one in the past four years, where I provided a report on behalf of Stoel Rives in a matter entitled *Honarvor, et al. v. Bank of the West*. I submit this declaration in support of BlendJet's Response to Blendtec's Motion to Enforce the Protective Order, to Disqualify Patrick McGill and Sheppard Mullin, and for Attorneys' Fees.

5. Having practiced law for approximately 35 years, 27 of those in Utah, I am familiar with the standard of care applicable to lawyers in Utah, and in particular, the standard of care applicable to litigation and trial attorneys. Also, a significant portion of my practice has centered on claims for professional liability, and specifically legal malpractice lawsuits, which have involved the standard of care and practices of lawyers in Utah. This work often involves

2

analysis and application of the Utah Rules of Professional Responsibility. This includes representing lawyers in ethical proceedings initiated by the Office of Professional Conduct.

6. In addition to my work in the field of legal malpractice on behalf of clients, I also represent lawyers in my office and throughout our firm as "Loss Prevention" counsel. In this role, I act as a consultant and counsel to the firm. I have filled this role for approximately 25 years. There are approximately 480 lawyers throughout the firm and about 65 of those are located in Salt Lake City, Utah. My goal as one of the firm's Loss Prevention counsel is to help prevent legal malpractice claims against the firm through training, consultation, analysis, and advice, but when claims do arise, I represent firm lawyers in connection with such claims. To fulfill this responsibility, I am in monthly, weekly, and often daily consultation with various members of our firm in which I analyze appropriate standards of care, best practices, and sound judgment concerning a myriad of attorney-client relationships and legal and factual circumstances.

7. Separate, but often related to my responsibility as Loss Prevention counsel, I also serve as Ethics Counsel within our firm and office. I have filled this role for approximately 25 years as well. I act as a consultant on ethical issues also on a monthly, weekly, and often daily basis. These ethical issues run the gamut of circumstances contemplated by the Utah Rules of Professional Responsibility. Therefore, I also have analyzed and consulted on hundreds of ethical scenarios.

8. I completed a six-year term as a member of the Utah State Bar Ethics Screening Panel, which is appointed by the Utah Supreme Court to hear claims of ethics violations against members of the bar brought by the Office of Professional Conduct. The Screening Panels meet

3

approximately quarterly to hear such cases and to impose sanctions, dismiss claims, or refer them to the Utah courts for prosecution.

9. In addition to the training I do, formally and informally, within my firm on loss prevention and ethical issues, I am a regular speaker at the Utah State Bar Ethics School on legal malpractice, standard of care, best practices, and ethical issues. The School is held twice each year. In addition, from time to time I have been invited speaker to various subsections of the state bar on such issues.

10. My opinions set forth below are based upon my training, experience, and research specific to this matter identified below.

**II.     Summary of Facts**

11. In forming my opinions in this matter, I have relied on and assumed the following facts:

   a. On January, 2019, Patrick McGill entered into a master services agreement with BlendJet (previously Miramore Inc) (the "**Services Agreement**"). The Services Agreement provided that Mr. McGill would work as a consultant and independent contractor for legal services. ████████████████████████████████
   ████████████████████████████████████████████████████
   ████████████████████████████████████████████████████
   ████████████████████████████████████████████████████
   ██████████████████████████████████

   b. Approximately three months after he signed this Services Agreement with BlendJet, he joined the firm of Sheppard, Mullin, Richter & Hampton LLP ("**Sheppard Mullin**"). Upon joining Sheppard Mullin, Mr. McGill terminated his

4

        Services Agreement with BlendJet.  BlendJet subsequently retained Sheppard Mullin, to represent it in various matters and pursuant to Sheppard Mullin's then-standard engagement agreements.

c. Approximately two-and-a-half years after Mr. McGill joined Sheppard Mullin, Blendtec sued BlendJet in the present action, *Blendtec Inc. v. Blendjet Inc.*, Civil No. 2:21-cv-000668-TC-DBP, pending in the United States District Court for the District of Utah (the "**Lawsuit**").  BlendJet hired Sheppard Mullin to represent it in this case.  Although Mr. McGill was the relationship attorney for BlendJet, Martin Bader and Lisa Martens were the partners on the case and lead counsel.  Mr. McGill worked on the case as an associate, as did Jesse Salen.

d. In February ,2023, Mr. McGill left Sheppard Mullin to start his own law firm, McGill & Co., P.C..  BlendJet then entered into a new engagement agreement with McGill & Co., P.C. (the "**Engagement Letter**") so that Mr. McGill remained outside counsel of record, alongside Sheppard Mullin, in this lawsuit and for other matters. ███████████████████████████
███████████████████████████
███████████████████████████
█████████████████████

e. ███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████

████████████████████████████████████████

████████████████████

  f. As part of the initial scheduling order, the Court adopted the Utah Federal Court Standard Protective Order ("**SPO**"). Consistent with the SPO, various documents and information produced by Blendtec in response to BlendJet discovery requests were designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" ("**AEO**"). Consistent with his rights and obligations as counsel, Mr. McGill received AEO information and treated it as confidential consistent with his obligations as outside counsel. He did not disseminate any AEO to his client. Nor did he use any AEO information outside the scope of the Lawsuit.

## III. Opinions

**Opinion 1:** <u>Mr. McGill's Representation Of BlendJet Is Consistent With The Function Of Outside Counsel, Not In-House Counsel</u>.

  12. I understand that Blendtec's motion to disqualify Mr. McGill and Sheppard Mullin is based in large part upon the assertion that Mr. McGill was acting as in-house counsel for BlendJet and, to that extent, should not have received AEO information. In my opinion, under the standards and regular practices in Utah, Mr. McGill would not be considered in-house counsel for several reasons.

  13. First, a client's reference to outside counsel as "general counsel" or describing outside counsel as a "trusted advisor," does not create a relationship of in-house counsel. All lawyers are, and should be, trusted advisors to their clients. All lawyers owe fiduciary duties to their clients. This is true whether they are in-house or outside counsel. *See, e.g.*, *Catheter Connections Inc. v. Ivera Medical Corp.*, No. 2:14-cv-70, 2014 WL 3945880 at *2 (D. Utah

Aug. 12, 2014) ("[l]ike retained counsel, however, in-house counsel are officers of the court, are bound by the same Code of Professional Responsibility, and are subject to the same sanctions").

14. Second, if Mr. McGill ever was to be considered in-house counsel to BlendJet—an assumption that would run contrary to the express terms of his written Services Agreement with BlendJet—that relationship ended when he joined Sheppard Mullin and approximately two years before Blendtec filed this lawsuit. As such, at the time the parties were negotiating whether to apply the SPO to the Lawsuit, any in-house relationship between Mr. McGill and BlendJet had long since terminated, and Mr. McGill performed merely as outside counsel in this lawsuit. Even after Mr. McGill left Sheppard Mullin, he still remained outside counsel pursuant to the new written Engagement Letter.

15. Third, the Services Agreement that Mr. McGill signed with BlendJet before he went to work for Sheppard Mullin did not make McGill an employee of BlendJet. To the contrary, it expressly created only an outside counsel relationship as consultant and independent contractor. In-house counsel in Utah are lawyers who are employees of the company, which was not the case with Mr. McGill and BlendJet. Moreover, even if Mr. McGill had been in-house counsel before leaving to join Sheppard Mullin, there is no allegation or evidence that he remained so after joining Sheppard Mullin.

16. Thus, I see no facts or circumstances regarding Mr. McGill's representation of BlendJet that would create an in-house relationship with BlendJet under the regular standards and practices of attorneys in Utah.

17. More importantly, whether Mr. McGill was in-house or outside counsel is the wrong question as at all times during the lawsuit he has been outside counsel and expressly authorized to receive AEO information under the SPO. The proper question here is whether Mr.

McGill should remain qualified to receive AEO information under the Court's standard protective order. That question is not answered by whether McGill represented BlendJet internally or externally. Rather, to determine who should have access to AEO information under a protective order, the touchstone criterion is whether the receiving party is "involved in 'competitive decisionmaking.'" *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (quoting *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984) (hereinafter, "*U.S. Steel*")). This analysis is set out in *U.S. Steel*, the "leading authority on protective orders distinguishing between outside and in-house counsel" for purposes of determining whether a party may access AEO materials. *Brown Bag*, 960 F.2d at 1470. The Federal Circuit in *U.S. Steel* concluded that "status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access" to AEO documents. *U.S. Steel*, 960 F.2d at 1468.

18. Indeed, *U.S. Steel* cautioned against "arbitrary distinctions based on type of counsel employed" and instead focused on the "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained" concluding that such examination "must govern any concern for inadvertent or accidental disclosure." *U.S. Steel*, 960 F.2d at 1468. For example, it is well-understood that competitive decision-making is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.*

19. And, even if a court determines that there is a risk of inadvertent disclosure based on the receiving party's involvement in competitive decision-making, the court still must weigh

8

the "risk of potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1380 (Fed. Cir. 2010).

20. In a factually similar case interpreting *U.S. Steel* under the District of Utah's Standard Protective Order, the court in *Catheter Connections Inc. v. Ivera Medical Corp.*, No. 2:14-cv-70, 2014 WL 3945880 (D. Utah Aug. 12, 2014) determined that disclosure of AEO documents to a client's former in-house counsel (and then-current member of outside counsel team) did not carry an unacceptable risk of inadvertent disclosure. The Utah Federal District Court noted that "there is no dispute that Ms. Williams was once a competitive decision maker who would not be entitled to see [the opposing party]'s 'attorneys' eyes only' or 'outside counsel only' information. Now, however, her role and relationship with [the client] has changed. The Court cannot simply ignore her past role with Catheter and the close proximity in time between competitive decision maker and outside counsel/ consultant does create some concern for the Court. But this concern is overcome by Ms. Williams current responsibilities, her supervisor that she reports to who is outside counsel and the fact that pricing and marketing information rapidly changes in the now global economy. Thus, in looking closely at Ms. Williams current roles in the affairs of [the client] her association with those involved in competitive decision making at [client's company] . . . the Court is convinced that there is not an unacceptable risk of inadvertent disclosure in this case." *Id.* at *3.

21. In sum, even if Mr. McGill had once been a competitive decision-maker at BlendJet in 2019—and I have seen no evidence or non-speculative allegation that he was at any time—under the Utah Federal District Court's application of the standard protective order, McGill should not have been considered a competitive decision-maker for BlendJet at the time

9

the parties were negotiating whether to apply the SPO to the Lawsuit (when Mr. McGill was an attorney at Sheppard Mullin). Thus, a reasonable lawyer in Mr. McGill's situation would not have considered himself either in-house counsel or a competitive decision-maker to BlendJet at the time he received AEO information.

22. The same analysis and conclusion holds true with respect to Mr. McGill's status as outside counsel providing services under the current Engagement Letter. Even if he had once been a competitive decision-maker at BlendJet—and I, again, have seen no evidence or non-speculative allegation that he was at any time—the applicable law in Utah would not prevent him from receiving Blendtec's AEO information because he is now serving as outside legal counsel through McGill & Co. P.C.

**Opinion 2:** **McGill's ▮▮▮▮▮▮▮▮▮▮▮▮ BlendJet Was Consistent With The Utah Rules Of Professional Conduct**.

23. Whether a lawyer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is a question that has long been decided in Utah and elsewhere. This was the specific issue in a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After analyzing this issue under Rules 1.5, 1.7, and 1.8, the Ethics Advisory Board concluded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is not per se unethical so long as the requirements of Rules 1.5, 1.7, and 1.8 are satisfied. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24. Numerous other ethics boards and courts have reached the same conclusion. *See* Utah Ethics Opinion USB EAOC Opinion No. 97-05 ("[t]he Utah rules of Professional Conduct permit an attorney to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ American

10

Bar Association Formal Opinion ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D.C. Bar Ethics Opinion ▮▮▮ ("[i]t is not unethical for a lawyer to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so long as the arrangement is a reasonable one, is objectively fair to the client, and has been agreed to by the client after being informed of its implications and given an opportunity to seek independent counsel on the fee arrangement"; NYC Bar Formal Opinion ▮▮▮▮▮ ("[a]ttorney may, in certain circumstances, ethically ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . .").

25. Thus, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ does not raise any reasonable ethical concerns under the Utah Rules of Professional Conduct and, is within the standard of care and regular practice in Utah. As evident from the dates of the Utah bar opinions mentioned above, a lawyer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was more regular during the late 1990's and early 2000's, but that practice continues for some lawyers today.

26. Mr. McGill's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ likewise does not raise ethical concerns. The ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I have seen no facts or non-speculative allegation that any ▮▮▮▮▮▮▮▮ was unreasonable or inappropriate under these rules.

27. Similarly, the fact that Mr. McGill received ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ also does not raise any ethical concerns under the Utah Rules of Professional Conduct, and is

11

within of the standard of care and regular practice in Utah. ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

In that sense, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Further, my understanding is that BlendJet is no longer a s-corporation, so ███████

███████████████████████████████████████████████████████████████

████████████████████████

28. Moreover, Mr. McGill's ███████████████████████████ ███████████████████ and consistent with McGill's responsibilities under the Rules of Professional Conduct. I have seen no facts that suggest McGill's interests in the Lawsuit were in any way adverse to BlendJet's interests due to McGill's ███████████████—which is the concern of the ethics opinions discussed in Paragraph 24 and 26 above. I have seen no allegation or evidence that he did not comply with his ethical responsibilities to BlendJet.

29. Even if Mr. McGill did have a conflict of interest with his client due to █ ███████████ that would not provide a basis for Blendtec—which is not Mr. McGill's client and in fact the party adverse to McGill's client—to seek disqualification of Mr. McGill or Sheppard Mullin. It would be counterintuitive to the lawyer-client relationship if an adverse party could assert a conflict of interest to which it is not a party and which both the affected lawyer and client have agreed to waive. *See Packer v. Utah Attorney General's Office*, 2013 UT App 194, ¶ 11, 307 P.3d 704 ("a person lacks standing to disqualify counsel unless the person has an attorney-client privilege with the attorney to be disqualified"); *see also* 7A C.J.S. Attorney

12

and Client § 175 (2004) ("Generally, only a party who is a client of an attorney who undertakes to represent conflicting interests may be entitled to object to such representation.")

30. Additionally, at a time when AEO designations are so prevalent that they apply to every case as a matter of course under the Court's standard protective order, any rule that would prevent lawyers from representing their clients in cases involving the exchange of AEO information on the basis of ▮▮▮▮▮ alone would be unreasonable and impinge upon one of the fundamental purposes of the Utah Rules of Professional Conduct, which is to allow clients to select and guide their lawyers. Such a standard also would be difficult or impossible to police because many lawyers ▮▮▮▮▮ Unintended consequences such as these demonstrate the reasonableness of basing AEO dissemination on factors other than the lawyer's status of in-house or outside counsel, or ▮▮▮▮▮ in his or her client.

31. For these reasons, a reasonable lawyer in Mr. McGill's situation would not have considered a ▮▮▮▮▮ to be a barrier to receiving an opposing party's AEO information years later when he or she was acting as outside counsel of record and—most importantly—when he or she was not involved in competitive decision-making at his or her client.

**Opinion 3: McGill And Sheppard Mullin Acted Consistently With Their Obligations Under The Utah Rules Of Professional Conduct And As Officers Of The Court.**

32. Mr. McGill and his former law firm, Sheppard Mullin, have acted as litigation counsel of record for BlendJet during this Lawsuit. As the standard protective order explains,

13

litigation counsel are precisely the persons to whom AEO information can and must be disclosed. Mr. McGill received that AEO information in his litigation counsel capacity and Sheppard Mullin did the same. Thus, the protective order worked as intended.

33. Not only were Mr. McGill and Sheppard Mullin bound by the standard protective order, as the *Catheter Connections* court explained, they had multiple obligations to maintain the AEO information in confidence and I have seen no evidence that they acted otherwise. *See Catheter Connections*, 2014 WL 3945880 at *2.

34. Mr. McGill and Sheppard Mullin were under numerous obligations to maintain the confidentiality of any AEO information they received and thus reduced or eliminated risk of harm for unauthorized disclosure. Mr. McGill and Sheppard Mullin were bound, first of all, by the language of the standard protective order. As outside counsel to BlendJet, they were obligated to maintain the AEO status of the documents and not provide any AEO to the client. By any an all accounts, they fulfilled that obligation. Beyond that, Mr. McGill and Sheppard Mullin also were bound by the broader obligations of confidentiality under Rule 1.6, which prevents them from making any disclosures of anything learned in the lawsuit outside the scope of the lawsuit. More generally, Mr. McGill and Sheppard Mullin were and are officers of the Court by virtue of their appearance in this lawsuit. They therefore are duty-bound to follow the Court's orders and the Utah Rules of Professional Responsibility.

35. To date, Mr. McGill and Sheppard Mullin have not been accused of intentionally or inadvertently disseminating AEO information to BlendJet, only receiving such information. The purpose of a protective order is to protect sensitive information (that necessarily must be disclosed in the context of a lawsuit) from being used by one party to harm the other outside the context of the lawsuit. For example, protective orders help maintain a competitive balance

between two competitors. They also prevent one party from using sensitive information to caue economic damage to the other. But protective orders typically are not and should not be used to create a procedural or substantive disadvantage for the parties in the lawsuit, and particularly when, as here, there are no allegations that any AEO information was intentionally or inadvertently disseminated beyond the qualified outside counsel.

36. Thus, under the circumstances of this case, Mr. McGill and Sheppard Mullin reasonably received and used AEO information according to the terms of the standard protective order and Utah Rules of Professional Responsibility.

**Opinion 4:** <u>**McGill Did Not Commit Ethical Misconduct That Taints The Proceeding**</u>.

37. Blendtec raises Mr. McGill's alleged misconduct in receiving AEO information in the context of a motion to disqualify not only him, but his former law firm, Sheppard Mullin. As explained by this Court in *Christensen v. Graco Fishing & Rental Tools, Inc.*, No. 2:20-cv-00888, 2021 WL 824752, *2 (D. Utah Mar. 4, 2021), a party seeking the disqualification of another party's attorney bears the "heavy burden of demonstrating that disqualification is necessary" due to a "violation of the Utah Rules of Professional Conduct." Furthermore, "[t]he sanction of disqualification in litigation situations should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon the trial. . . . The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit." *Id*.

38. It will remain for the Court to "measure the facts" and determine whether Mr. McGill's receipt of AEO information, alone, somehow "taints the lawsuit." But for my analysis I have not been able identify any particular Rule of Professional Conduct that McGill allegedly violated other than the circular statement that "McGill's conduct also violated the Utah Rules of

15

Professional Conduct 3.3, 3.4, 4.1, and 8.4" because "disqualification of counsel is an appropriate sanction for a breach of ethical duties." (Motion at 10.) Nor can I see any allegations that McGill's receipt of AEO information has resulted in a tainted proceeding. Further, with respect to Sheppard Mullin, the law and standard of care in Utah is that "imputed disqualification only applies if Rule 1.7 or 1.9 [involving conflicts of interest] apply." *Pedersen v. Hartford Ins. Co. of the Midwest*, No. 201CV00398 PGC, 2003 WL 23354482, at *2 (D. Utah Oct. 3. 2003).

39. It is my opinion that reasonable and prudent lawyers in Utah reasonably would have concluded, as Mr. McGill did, that his former or current relationship with BlendJet not only permitted but required him to receive and evaluate AEO information and to avoid disseminating that AEO information to BlendJet. That appears to be exactly what he did. Sheppard Mullin, likewise, acted reasonably under the Utah Rules of Professional Conduct, the standard protective order, and the standard of care for law firms in Utah.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 16, 2023, in Salt Lake City, Utah.

_____
Matthew L. Lalli